# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS OF IRIDIUM INDUSTRIES, INC, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-1488-NAC |
| | ) | |
| KHOSROW (JACK) SASSOUNI, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| IRIDIUM INDUSTRIES, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 13, 2026
Date Decided: August 5, 2026

Samuel L. Closic, Caitlin E. Whetham, Brianna V. Manobianco, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Counsel for Plaintiff*.

Lisa A. Schmidt, John M. O'Toole, Hanna G. Lambert, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Defendant*.

**COOK, V.C.**

This is an action for declaratory judgment against the co-founder of Iridium Industries, Inc. The defendant is a director, chief executive officer, and major stockholder of the corporation. The verified complaint identifies the corporation as the plaintiff in this action. The allegations, made under oath, provide that the plaintiff-corporation brings the action through the two-member special committee of the corporation's three-member board of directors. Invoking the forum selection clause in a stockholder agreement signed by the corporation and defendant that has been in place since the corporation's founding nearly three decades ago, the defendant argues this matter belongs in arbitration. For the reasons explained below, the Court grants the defendant's motion to stay this proceeding pending the arbitrators' decision on substantive arbitrability.

## I. BACKGROUND

### A. The Stockholder Agreement

In 1998, brothers Khosrow (Jack) Sassouni and Eli Sassouni founded Iridium Industries, Inc. ("Iridium" or the "Company").[1] The Company is a leading United States manufacturer of squeezable plastic tubes.[2] It does business under the trade name "Artube."[3] The Company has always been a privately held company.

The Company has a longstanding stockholder agreement in place. In mid-November 1998, the Company and its sole two stockholders, Jack and Eli, entered

---

[1] Dkt. 1 ("Compl.") ¶ 7; *Nazarian v. Sassouni*, 2025 WL 1913182, at *1 (Del. Ch. July 11, 2025). Because several relevant parties and non-parties share last names, the Court refers to them using their first names. No familiarity or disrespect is intended.

[2] *Nazarian v. Sassouni*, 2025 WL 1913182, at *1 (Del. Ch. July 11, 2025).

[3] *Id.*

into an agreement concerning the Company's governance ("Stockholder Agreement").[4] The recitals provide that the agreement was "made and entered into" by and among Jack, Eli, and the Company as well as "any other future owner and holder of shares of the [Company] who may hereafter become a party to, or subject to" the Stockholder Agreement.[5] The Stockholder Agreement "shall bind the parties hereto and their respective heirs, administrators, executors, successors and assigns."[6] Jack, Eli, and the Company (through Eli) signed.

The Stockholder Agreement contains governance, indemnification, corporate status, financing, and transfer provisions. The recitals provide that the "SHAREHOLDERS hereto deem it to be in the best interest of the [Company] to act together concerning the management and operation of the [Company.]"[7] Eli and Jack would serve as "Directors of the [Company]."[8] They also received indemnification rights[9] and were obligated to loan $500,000 each to the Company.[10] Further, the Company is to be an "S" corporation,[11] and its stockholders are not allowed to freely transfer their shares.[12]

---

[4] Dkt. 12 ("MTD Opening Br."), Ex. A. ("SA"). I note that the parties refer to the agreement as the "Shareholders Agreement" in their briefs.

[5] SA, Recitals; *accord* SA (reflecting signatures for the Company, Jack, and Eli). The Stockholder Agreement refers to Jack and Eli as the "SHAREHOLDERS." SA, Recitals.

[6] SA, Art. 14.

[7] SA, Recitals.

[8] SA, Art. 1.A.

[9] SA, Art. 1.D.

[10] SA, Art. 1.G.

[11] SA, Art. 1.F.

[12] SA, Art.2.A, 3.A, B.

In 2001, Eli's father-in-law, Parviz Nazarian, purchased shares of Iridium stock.[13]  Parviz agreed "to be bound by the terms and provisions of [the Stockholder Agreement.]"[14]  With the addition of Parviz, the stockholders and Company amended the Stockholder Agreement to allow for "shares owned by a deceased Shareholder [to] pass to the deceased Shareholder's wife, descendants or . . . trusts created for the benefit of his wife and/or descendants."[15]  Shares would remain within the family.

Last, the Stockholder Agreement has always included a very broad arbitration clause.  As explained below, the clause covers all disputes "arising out of or pertaining to" the Company.[16]

## B. Iridium's Governance

For decades, Jack stood at the helm of the Company as its director and Chief Executive Officer.  In 2009, Eli died.[17]  His shares transferred to trusts for the benefit of his wife and each of his three sons, which included Eliott Sassouni.[18]  Jack then became a co-trustee of the trusts and served in that role for several years.[19]  That changed beginning in 2023.  After Eli's wife and three sons filed petitions in New York Surrogate Court to compel Jack to account as co-trustee, the court removed him

---

[13] MTD Opening Br., Ex. B.

[14] *Id.*

[15] MTD Opening Br., Ex. C.  On separate signature lines, Jack signed on behalf of himself and Iridium.

[16] SA, Art. 13(A).

[17] *Nazarian*, 2025 WL 1913182, at *1.

[18] *Id.*

[19] *Id.*, at *2.

3

as co-trustee.[20] The New York court in turn appointed Benjamin Nazarian to replace him.[21]

Not long after his appointment, Benjamin exercised the new trust power. He called an annual meeting and vote for the Board, which took place on December 9, 2024.[22] At the meeting, the stockholders voted to increase the Board from one to three members and elected Benjamin, Eliott (Jack's nephew), and Jack to the Board.[23]

Jack, however, did not recognize the effectiveness of the vote. Instead, Jack's counsel stated that the results would "be held in abeyance until there is a resolution of the litigation pertaining to Mr. Nazarian's trusteeship and ability to vote the Trust Shares."[24] Two days later, and without giving Benjamin or Eliott prior notice, Jack purported to issue a dividend of nearly all of the Company's available cash to the Company's stockholders, in an aggregate amount of $6.75 million ("Dividend").[25] Neither Jack nor his counsel informed Benjamin, Eliott or the trusts' other beneficiaries of the purported distribution until several weeks later.[26] Jack cashed the check for his $2.7 million pro rata share of the Dividend; he was the only

---

[20] *Id.*

[21] *Id.* Benjamin Nazarian is the son of Pouran Nazarian. *Id.*, at *1. Pouran was Parviz' wife and recipient of Parviz' shares in the Company after his death in 2017. *Id.*

[22] *Id.*, at *2–3.

[23] *Id.*

[24] *Id.*, at *3.

[25] *Id.*, at *3.

[26] *Id.*

4

stockholder to do so.[27]  On January 13, 2025, Benjamin and Eliott convened a Board meeting without Jack and voted to declare the Dividend unauthorized and void.[28]

## C.    Multiple Lawsuits Follow Amidst Board Disagreement

On January 16, 2025, Benjamin and Eliott initiated an action in this Court under § 225 of the Delaware General Corporation Law ("DGCL") to determine the composition of the Board.[29]  On July 11, 2025, after trial, the Court issued a decision finding that Benjamin, Eliott, and Jack comprised Iridium's Board.[30]

Issues continued to arise between Jack and the other members of the Board during August and September.  At a Board meeting that Jack did not attend, Benjamin and Eliott resolved to hire, on an interim basis, Doug Flannery to serve as the Company's chief financial officer ("CFO"), chief operating officer and treasurer.[31] But Flannery resigned because the Company could not obtain Directors & Officers Insurance for him, due allegedly to Jack's refusal to provide necessary information.[32] The parties were also unsuccessful in negotiating a proposed buy-out of certain Company shares.[33]

---

[27] *Id.*

[28] *Id.*, at *4.

[29] Compl. ¶ 14.

[30] *See Nazarian*, 2025 WL 1913182, at *1.

[31] Compl. ¶ 30.

[32] *Id.* ¶ 35.

[33] *Id.* ¶¶ 30–50.

Unable to reach agreement with Jack on these issues, the Board called a special meeting on October 17, 2025.[34] Benjamin and Eliott voted to make Flannery interim CFO again, with Jack voting in opposition.[35] The Board also "established the Special Committee[, consisting of Benjamin and Eliott,] with the authority to, among other things, bring a lawsuit against Jack to return the [Dividend.]"[36] "The Special Committee [was] fully empowered to act on behalf of the Company."[37]

Multiple lawsuits soon followed. On October 21, "Plaintiff Iridium" commenced an action in this Court seeking disgorgement of Jack's $2.7 million share of the Dividend.[38] Three days later, Jack paid $2.7 million to the Company.[39] "Plaintiff Iridium[,]" "by and through a Special Committee of Iridium's Board of Directors," then filed an amended and supplemented complaint against Jack seeking interest and costs in bringing that action.[40]

On November 25, the Special Committee filed a Verified Derivative Complaint commencing another action in this Court against Jack, as well as his two sons. The complaint in that action provides that it is a "derivative action brought by the Special Committee of Iridium" for breaches of fiduciary duty based on certain conflicted

---

[34] *Id.* ¶ 57.

[35] *Id.* ¶ 57.

[36] *Id.* ¶ 20.

[37] *Id.* ¶ 20.

[38] *Iridium Industries, Inc. v. Khosrow (Jack) Sassouni*, C.A. No. 2025-1199-NAC (Del. Ch.), Dkt. 1., Compl., Opening Paragraph.

[39] Compl. ¶ 21.

[40] *Iridium Industries, Inc. v. Khosrow (Jack) Sassouni*, C.A. No. 2025-1199-NAC, Dkt. 6, Am. and Supp. Verified Complaint, Opening Paragraph.

transactions.[41]  The "Parties" section of the Verified Derivative Complaint provides: "Plaintiff is the Special Committee of the Board of Directors of Iridium Industries, Inc."[42]  The complaint includes a paragraph, with the heading "DEMAND IS FUTILE," alleging why "demand . . . is excused."[43]

On December 23, the Special Committee filed the Verified Complaint ("Complaint") commencing this action.  The Complaint alleges that Jack is improperly withholding access to Iridium's financial books and records from Flannery.[44]  The case caption on the Complaint identifies the Special Committee as Plaintiff and the Company as Nominal Defendant.  But, unlike the derivative complaint commencing the November 25 action, the complaint in this action is titled "Verified Complaint" and does not describe the action as derivative in nature or include any allegation as to demand futility.  Further, the "Parties" section of the Complaint identifies the Company as the plaintiff, providing: "Plaintiff Iridium Industries, Inc. . . . brings this action through the Special Committee . . . ."[45]  The Complaint contains one count: a declaratory judgment claim seeking "a declaration that Flannery's appointment by a majority of the Board and powers associated

---

[41] *The Special Committee of Iridium Industries, Inc. v. Khosrow (Jack) Sassouni et al.*, C.A. No. 2025-1378-NAC (Del. Ch.), Dkt. 1., Verified Derivative Compl., ¶ 1.

[42] *Id.* ¶ 5.

[43] *Id.* ¶ 36.

[44] Compl. Opening Paragraph.

[45] *Id.* ¶ 7.

7

therewith are binding and valid."[46]  Despite the nature of the requested declaration, this action is not brought pursuant to 8 *Del. C.* § 225.

Confronted with these lawsuits, Jack invoked the forum-selection clause in the Stockholder Agreement.[47]  Jack moves to dismiss the Complaint under Court of Chancery Rule 12(b)(1), arguing that the claim in this action is subject to mandatory arbitration and that the question of substantive arbitrability is delegated by agreement to the arbitrators.  If the Court determines not to dismiss the action outright, Jack asks in the alternative for a stay until the arbitrators decide whether the claim falls within the scope of the parties' agreement to arbitrate.  On February 17, 2026, Jack filed a Demand for Arbitration with the American Arbitration Association ("AAA") in New York.[48]  The Court held oral argument on Jack's motion on April 13, 2026.[49]

Jack's argument to dismiss or stay this action is straightforward.  He argues that the Special Committee filed the Complaint on behalf of the Company; the Company and Jack are signatories to the Stockholder Agreement; the Stockholder Agreement contains an agreement to arbitrate; thus, a binding arbitration agreement exists between the parties.  Jack further contends that the parties expressly

---

[46] *Id.* ¶ 74.

[47] The parties agreed by stipulation to address the issue in this action first.  Dkt. 11.

[48] The Demand for Arbitration asserts claims against numerous parties including the Company as a nominal defendant, Benjamin, and Eliott.  Dkt. 23.

[49] Following oral argument, the Special Committee filed a letter informing the Court that Benjamin and Eliott requested that the arbitrators join the Special Committee as an indispensable party to the arbitration.  Dkt. 22.  That is a question for the arbitrators to decide.

8

delegated to the arbitrators the power to determine whether the current dispute falls within the scope of the agreement to arbitrate, *i.e.*, substantive arbitrability.

The Special Committee's arguments are difficult to follow. It argues that the Special Committee itself did not sign the Stockholder Agreement and is not bound by the agreement to arbitrate. Relatedly, the Special Committee argues in briefing that Benjamin and Eliott are bringing this lawsuit in their capacities as directors and not stockholders and thus the Action, and they in particular, are not subject to arbitration. Next, the Special Committee seems to advance an argument calling for the Court to equitably override the parties' broad agreement to arbitrate. It concedes that 8 *Del. C.* § 122(18) authorizes "a stockholder's agreement [to] contain a forum selection clause that designates a forum other than the Delaware courts as the exclusive forum for resolving disputes."[50] Nonetheless, it argues that such a carve-out is "narrow and subject to this Court's equitable review."[51]

## II. STANDARD OF DECISION

The Court addresses the motion to dismiss under Rule 12(b)(1).[52] In the arbitration context, "[d]espite its framing as a motion to dismiss for lack of subject

---

[50] Dkt. 16 ("MTD Opp'n") at 18.

[51] *Id.*

[52] Although there may be confusion about whether it is proper to dismiss in favor of arbitration under Rule 12(b)(1) for lack of subject matter jurisdiction, or (3), for improper venue, Jack moved under Rule 12(b)(1), which for all practical purposes does not change the analysis. *See Gandhi-Kapoor v. Hone Cap. LLC*, 307 A.3d 328, 340 (Del. Ch. 2023), *as corrected* (Dec. 4, 2023), *aff'd sub nom. CSC Upshot Ventures I, L.P. v. Gandhi-Kapoor*, 326 A.3d 369 (Del. 2024) ("A motion to dismiss in favor of arbitration challenges the forum in which suit was filed, and the proper motion for disputing forum invokes Rule 12(b)(3) and presents a defense of improper venue. But strictly using Rule 12(b)(3) requires that a party

matter jurisdiction, Rule 12(b)(1) is [] used to argue about whether a court should exercise the subject matter jurisdiction that it possesses."[53] In deciding a 12(b)(1) motion to dismiss, the court may consider documents outside the complaint."[54]

## III. ANALYSIS

### A. The Agreement to Arbitrate

The Court first addresses whether an agreement to arbitrate exists between the parties in this action. "[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."[55] "A contract only exists between parties to the agreement."[56] Nonetheless, there are several instances in which "[c]ourts have . . . b[ound] nonsignatories to arbitration agreements."[57]

Plainly, an agreement to arbitrate exists. Article 13(A) of the Stockholder Agreement provides that:

> [a]ny claim or controversy among or between the parties hereto arising out of or pertaining to the [Company], or to any matter contained in this Agreement, or any difference as to the interpretation or performance of any of the provisions of this agreement shall be settled by arbitration in New York City, New York, before three (3) arbitrators of the American

raise the forum issue at the outset of the case, which means that if a party fails to invoke a forum selection clause promptly, a busy court could end up presiding over a case that the parties had agreed to litigate somewhere else . . . . [But] Rule 12(b)(1) is a suitable vehicle for raising challenges to a court's subject matter jurisdiction in its strict sense, as well as for raising arguments about why a court should not exercise its jurisdiction.").

[53] *Gandhi-Kapoor*, 307 A.3d at 340.

[54] *Legend Natural Gas II Hldgs., LP v. Hargis*, 2012 WL 4481303, at *4, n.25 (Del. Ch. Sept. 28, 2012) (citation omitted).

[55] *Gandhi-Kapoor*, 307 A.3d at 356 (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 139 (2019)).

[56] *Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 753 (Del. Ch. 2023).

[57] *Id.* (quoting *BuzzFeed, Inc. v. Anderson*, 2022 WL 15627216, at *8 (Del. Ch. Oct. 28, 2022)).

Association in accordance with its Commercial Arbitration Rules ["Arbitration Clause"].[58]

There is no meaningful dispute that the plain text of the Stockholder Agreement contains an agreement to arbitrate. The relevant question is whether that agreement is between the parties to this action. Here, this litigation is entirely between signatories to the agreement. Jack and the Company are signatories. Jack is the defendant. And the verified Complaint alleges under oath that the Company is the plaintiff: "Plaintiff Iridium Industries, Inc. is a corporation formed under the laws of the State of Delaware on October 21, 1998. Plaintiff brings this action through the Special Committee established on October 17, 2025."[59] An arbitration agreement thus exists between the parties to this action.[60]

To resist this conclusion, the Special Committee argues that it "is the Plaintiff in this Action"[61] and the Special Committee is not a party to or otherwise bound by the agreement to arbitrate. The committee also argues that its members bring this action as directors, not stockholders, and that this somehow means the agreement to arbitrate does not apply. But the Complaint makes plain that the Company is the

---

[58] SA, Art. 13(A).

[59] Compl. ¶ 7.

[60] It is therefore unnecessary to address the circumstances in which courts have concluded non-signatories are bound by agreements to arbitrate. For the same reason, the Special Committee's citation to the synopsis to the 2025 amendment to DGCL § 115 also is irrelevant and need not be addressed here. *See* MTD Opp'n at 19 (citing Del. S.B. 95, syn., 153d Gen. Assem. (2025)).

[61] MTD Opp'n at 13.

plaintiff in this action; the Special Committee cannot disclaim that verified allegation now simply because it is expedient to do so.[62]

Last, the Special Committee seems to argue, in passing, that it cannot be "restrained by the S[tock]holder[] Agreement."[63] The Special Committee does not elaborate on this weighty assertion. But, when causing the Company to exercise corporate power, that exercise of power remains subject to the Company's contractual obligations.[64] Thus, in causing the Company to bring this action, the Special Committee cannot disavow the Company's longstanding contractual obligations to counterparties to the Stockholder Agreement.

---

[62] The nature of this action, if anything, confirms this conclusion. The Complaint provides: "Plaintiff seeks a declaration that Flannery's appointment [as interim Chief Financial Officer] by a majority of the Board and powers associated therewith are binding and valid." Compl. ¶ 74; *accord* Prayer for Relief, ¶ A (seeking judgment "[d]eclaring that Flannery was properly appointed by the Board as Iridium's interim CFO"). Section 225(a) authorizes summary proceedings to "hear and determine the validity of any . . . appointment . . . of any . . . officer of [the] corporation . . . ." 8 *Del. C.* § 225(a). Yet, this action is not brought pursuant to § 225(a). The two Special Committee members already litigated to conclusion a § 225 summary proceeding against Jack, and the Complaint in this action repeatedly references that proceeding. That this action, then, is not brought as a summary proceeding pursuant to § 225(a) seems explicable only when one understands that, although a stockholder, director, or officer whose title to office is contested has standing to bring a § 225(a) claim, a corporation does not. *See, e.g.*, Donald Wolfe & Michael Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 9.09[c] (2025) ("[Section 225(a)] explicitly confers standing only upon stockholders, directors, and, in the limited circumstances . . . officers. A list from which the corporation itself is 'noticeably absent.' This analysis seems to draw reinforcement from the addition of Section 225(b) in 2008, which explicitly authorizes the corporation itself . . . to seek judicial review of a stockholder vote on matters other than the election of directors or officers.") (quoting *Insituform of N. Am. Inc. v. Chandler*, 534 A.2d 257, 270, n.11 (Del. Ch. 1987)).

[63] MTD Opp'n at 17.

[64] *See, e.g.*, *Wagner v. BRP Grp., Inc.*, 316 A.3d 826, 862–64 (Del. Ch.), *rev'd and remanded on other grounds*, --- A.3d ---, 2026 WL 1256588 (Del. May 7, 2026) ("'[T]he fiduciary status of directors does not give them Houdini-like powers to escape from valid contracts.'") (citations omitted).

12

## B. Delegation of Substantive Arbitrability

In evaluating Jack's motion, the next question is whether the at-issue dispute is arbitrable.[65] Determining arbitrability, in turn, requires answering a threshold question: "'who [] decide[s] whether the parties [] agreed to submit the [] issue to arbitration.'"[66] To answer that question, the Court "asks whether the parties have agreed to have an arbitrator decide the arbitrability question."[67] Delaware courts refer to that threshold inquiry as the "delegation question."[68]

The United States Supreme Court's decision in *Henry Schein, Inc. v. Archer & White Sales, Inc.* clarified how courts must address the delegation question.[69] "[P]arties [can] agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes."[70] Such contracts constitute "'an additional, antecedent agreement the party seeking arbitration asks the [] court to enforce[.]'"[71] Relying on the Federal Arbitration Act's requirement that courts "interpret contracts as written," the High Court held that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract."[72] Accordingly, "[i]n those circumstances, a court

---

[65] *See Blodgett*, 288 A.3d at 749–51.

[66] *Id.* at 751 (internal quotation marks omitted).

[67] *Id.* at 748 (citations omitted).

[68] *E.g.*, *id.* at 748–49, 756–58.

[69] 586 U.S. 63 (2019).

[70] *Id.* at 65.

[71] *Id.* at 68 (quoting *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. 63, 70 (2010) (edits added)).

[72] *Id.* at 68.

possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."[73] Under *James & Jackson, LLC v. Willie Gary, LLC,* parties have "clear[ly] and unmistak[ably]" delegated arbitrability to the arbitrators where "the arbitration clause generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability."[74]

Applying this standard, the Arbitration Clause unquestionably delegates arbitrability to the arbitrators. The Arbitration Clause is extraordinarily broad, assigning to arbitration "any claim or controversy" among the parties "arising out of or pertaining to" the Company, "any matter contained in" the Stockholder Agreement, or "any difference as to the interpretation or performance of any of the provisions" of the Stockholder Agreement.[75] And the Arbitration Clause incorporates a set of arbitration rules that empowers arbitrators to decide arbitrability—here, the AAA's Commercial Arbitration Rules. Specifically, Rule 7(a) empowers arbitrators to decide arbitrability.[76] Given this, substantive arbitrability is for the arbitrators to decide.

---

[73] *Id.* at 68.

[74] 906 A.2d 76, 80 (Del. 2006).

[75] SA, Art. 13(A).

[76] AAA Commercial Arbitration Rule R–7(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court."), https://www.adr.org/media/ueonklrv/2026_commercial-arbitration-rules-mediation-procedures.pdf.

The Special Committee does not address substantive arbitrability.[77] Instead, the Special Committee seems to argue that the Court should undertake some form of equitable review of whether arbitration is appropriate in these circumstances. The committee's argument is difficult to follow. It seems the Special Committee proposes that the Court deploy some form of equitable override to deny Jack's motion based on his conduct, despite the presence of an agreement to arbitrate that delegates substantive arbitrability to the arbitrators.[78]

But *Schein* requires the Court to "interpret the contract as written" and, upon finding a valid agreement to arbitrate, "enforce the arbitration agreement[] according to [its] terms."[79] As explained, the Arbitration Clause is exceedingly broad. It refers to arbitration, among other things, any controversy among the parties pertaining to the Company or any difference as to the performance of any provision of the Stockholder Agreement.[80] The Arbitration Clause also expressly incorporates rules that empower the arbitrators to rule on "[their] jurisdiction" and "any objections with respect . . . to the arbitrability of any claim[.]"[81] The arbitrators thus have the power to decide the Special Committee's objection to enforcement of the Arbitration Clause as to the declaratory judgment claim here. Applying the reasoning of *Schein* and

---

[77] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[78] MTD Opp'n at 20–25.

[79] *Schein*, 586 U.S. at 68.

[80] The Arbitration Clause is, of course, a provision of the Stockholder Agreement.

[81] AAA Commercial Arbitration Rule R–7(a).

enforcing the Arbitration Clause's terms, the committee's objection to arbitrability based on Jack's conduct is a question that the arbitrators must decide.[82]

## C. DGCL § 122(18)

Last, the Special Committee seems to argue that the Complaint's declaratory judgment claim is not arbitrable because the claim's existence does not depend on the Stockholder Agreement. The Special Committee cites the Delaware Supreme Court's 2002 decision in *Parfi Holding AB v. Mirror Image Internet, Inc.*,[83] seemingly invoking what this Court has described as the Independent-Source Principle.[84]

In 2024, the General Assembly enacted § 122(18). That provision of the DGCL authorizes a Delaware corporation to agree in advance, in a stockholder agreement

---

[82] *See In re Neworld Energy Holdings, LLC*, 2023 WL 5529689, at *1 (Del. Ch. Aug. 24, 2023) ("[U]nder the familiar *Willie Gary* test, if the relevant agreement presents 'clear and unmistakable evidence' that the parties intended to delegate issues of substantive arbitrability to an arbitrator, 'a court possesses no power to decide the arbitrability issue.'"); *see also Blodgett*, 288 A.3d at 753 (quoting *Schein*, 586 U.S. at 69). In addition, to the extent further consideration of the committee's argument would require the Court to delve into the merits of the underlying claim, that too would be improper. *See, e.g.*, *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.") (quotation omitted).

[83] 817 A.2d 149 (Del. 2002).

[84] *Masimo Corp. v. Kiani*, 2026 WL 1080396, at *7 (Del. Ch. Apr. 21, 2026) (describing Independent-Source Principle); *see also* MTD Opp'n at 22–23 ("Stated another way, neither the declaratory judgment nor fiduciary duty claims at issue 'depend on the existence of the [Stockholder] Agreement.'") (citing *Parfi*, 817 A.2d at 158).

covered by § 122(18), to route claims implicating the corporation's internal affairs to non-Delaware fora.[85] Such fora include arbitration.[86]

The Special Committee does not dispute that the Stockholder Agreement is authorized under § 122(18). Yet, the Special Committee maintains that a corporation cannot route internal affairs claims outside Delaware via contract. That was once true, as this Court's 2023 decision in *Harris v. Harris* explains.[87] But, as to stockholder agreements, § 122(18) statutorily abrogated the Independent-Source Principle.[88] With the General Assembly's enactment of § 122(18), the Independent-Source Principle does not serve as a basis to resist enforcement of the Arbitration Clause as to the declaratory judgment claim asserted here.[89] Instead, the Arbitration Clause "will be enforced . . . according to [its] terms."[90]

---

[85] *Masimo*, 2026 WL 1080396 at *8.

[86] *Mayya v. Lee,* 2026 WL 2160418, at *7 (Del. Ch. July 27, 2026) ("[A] corporation can agree in advance to resolve fiduciary duty claims via arbitration, so long as it does so via an agreement covered by § 122(18)."); *see Nat'l Indus. Grp. (Holding) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 384 n.41 (Del. 2013) ("[A]n arbitration clause 'is, in effect, a specialized kind of forum-selection clause.'") (quotation omitted).

[87] 2023 WL 193078, at *24–25 (Del. Ch. Jan. 16, 2023) ("If corporations wish to route internal affairs claims to a particular forum, then they can adopt charter or bylaw provisions designed to achieve that result . . . . A provision in a contract does not do the trick.").

[88] *Masimo*, 2026 WL 1080396, at *11.

[89] The Special Committee characterizes the declaratory judgment claim as implicating DGCL § 141(a). *See* MTD Opp'n at 22 ("In this action, the Special Committee's claims relate to the Board's appointment of, and grant of powers to, officers under 8 *Del. C.* § 141(a)."). That, if anything, further confirms that the claim falls squarely in the sights of § 122(18)'s abrogating effect. *Masimo*, 2026 WL 1080396, at *10 ("[B]y stating courts must evaluate § 122(18) agreements '[n]otwithstanding § 141(a),' the 141(a) Exclusion overrides the Independent-Source Principle.") (quoting 8 *Del. C.* § 122(18)).

[90] *Schein,* 586 U.S. at 67.

## IV. CONCLUSION

For the foregoing reasons, Jack's motion to stay this action pending the arbitrators' decision on substantive arbitrability is granted.[91]

---

[91] *See Erving v. ABG Intermediate Hldgs. 2, LLC*, 2022 WL 17246320, at *7–8 (Del. Ch. Nov. 28, 2022) (staying, instead of dismissing, action pending arbitrator's decision on substantive arbitrability).